20-2581 from the District of Nebraska. Robert Bruning et al. versus City of Omaha Nebraska. Mr. Brunel. All right, good morning. May it please the court. Ms. Taylor, my name is Jason Brunel here on behalf of Appellants Sharon and Robert Bruning and Mr. and Mrs. Bruning are sitting in my conference room here today. We are here asking this court to reverse the decision of the District Court and confirm or declare that the Bruning's right to equal protection was violated because the City of Omaha treated them differently than other similarly situated property owners without any legitimate or rational basis. We're also asking this court to stop the city from claiming that the Brunings are engaging in non-conforming or impermissible uses on their property because the city knew about and consented to the uses. I'm going to start with the equal protection argument because I think that's the more simple and easier one. The District Court's determination that the Bruning's equal protection rights were not violated was premised unquestionably upon a material mistake. The District Court unquestionably attributed actions and correspondence of a different property owner to the Brunings. The District Court mistakenly relied upon, I have it in my hand, it's page 1901 of the appendix, it's an email correspondence between the city and another party to determine that the Brunings did not cooperate or provide information to Jay Davis who was the head of the city's Permits and Inspections Department at the time. In fact, Jay Davis testified in deposition that the Brunings were nothing but cooperative and responsive throughout the entire process and that is consistent with the evidence in the record. So in other words, the District Court's rational basis determination was premised upon a mistake. The District Court relied upon events involving another property owner and we believe that mistake was significant and by itself requires reversal. Putting aside... What's our standard of review here? Is it de novo on the equal protection claim? It's a summary judgment standard of review, whether there were no disputed facts and the moving party was entitled to judgment as a matter of law. Well and I agree with you, I mean everyone's conceded there's that factual error that the District Court relied on, I don't think that's in question. But I do think if we're on de novo review, we can look at the entire record and there are two things I think that still support the One is the history of complaints against your client that prompted the city action, that there were several neighboring property complaints and with the other ten there were not, the other ten property owners. And I think even moreover, there's that history, even if your clients were generally cooperative, that history of discussion that wasn't present with the other ten property owners. Whether you put that in a similarly situated box with a discriminatory treatment box, I'm just wondering why we can't affirm on those two bases? Because the factual record does not support that. There was one complaint against the Brunings made by a neighbor who complains about everything and everyone. If you look at the record, the other neighbors were in overwhelming support of the Brunings and there's a lot of letters of support. Also the evidence shows that there were no traffic issues, no deaths, no injuries, no problems in relation to the Brunings property and their uses. And the complaints actually support the Brunings position of equal protection because the Brunings themselves made complaints about at least ten other comparable property owners who were doing the same thing in similar zoning. And that's where the disparate treatment comes in because nothing was done to the other property owners other than the sending of one letter back in 2017. On the contrary, everything was done to the Brunings. They were told to completely vacate their entire property within five days notice. They were threatened with criminal prosecution and criminal penalties. The city has basically harassed the Brunings for over five years. What has the city done to the other properties? Absolutely nothing. The have videos, we have websites, we have advertisements, we have expert testimony all showing that as of June of 2020, three years after the Brunings made their complaint, the city did absolutely nothing against the other properties that were engaging in similar uses. And that evidence we believe is undisputed and overwhelming in the record. What about the history? What about the history with those other property owners? I understand that may not take care of the three years, but the history of, I wouldn't call it negotiation, but the history of discussion between the the city and your client. In other words, you know, it appears that there was some cooperation, but they've reached a point where the things that the city had asked to be done were just not done. And so they just sort of said, okay, vacate the premises. I just want to give you a chance to respond. If I'm inaccurate about that, feel free to tell me. Yes, your honor, you're incorrect about that. And you know why? Because you're relying upon the same thing the district court relied upon. You're relying upon an email that was sent from the city of Omaha to another property owner that says, hey, we need this stuff from you. It wasn't the Brunings that didn't comply with that request. It was the other property. But the undisputed evidence in our record is overwhelming that the Brunings complied. I said it forth in my brief, Jay Davis, the guy who was running this inspection. I asked him multiple times, multiple ways that the Brunings provide all the information you requested. Yes, where the Brunings responsive to you? Yes. Were the Brunings cooperative with you? Yes. Was there anything you asked the Brunings to do that they weren't willing to do? And his answer was pretty much no. What happened is Mr. Davis said, well, I was busy doing other things, so I kind of forgot about the Brunings. So after the Brunings were reaching out saying, hey, what's going on? What's going on? Do you need any information from us? The next step in the process was that five day notice to vacate that was issued by Jay Davis. It wasn't the Brunings who weren't cooperating and responding to the city. It was the opposite. And that was a material error made by the district court relying upon emails that were sent to another party that in itself requires reversal in this case. What's the impact of any of the inquest case on your case? The for purposes of this case other than it establishes that the general rule that you need to treat all similarly, similarly situated individuals alike. And that didn't happen in this case. Uh, the inquest case, the parties weren't successful. But for purposes of this, we have overwhelming and undisputed evidence that the Brunings were treated differently than at least up 10 other comparable properties for without any legitimate basis. But you guys, there are certain kinds of governmental activities that are so inherently discretionary that class of one equal protection claim just doesn't work. Isn't that correct? Yes, but this isn't one of them. For example, why is this not one of them? Because because if you look, for example, at the Barstead case decided by this court, that was a property case. Um, in that case, there wasn't an equal protection claim because the other because the properties that were treated differently. Well, we fixed that problem. In this case, we identified 10. Um, if you look at the village of Willow Brook case, that case involved in the government demanding a 33 ft easement as opposed to 15, which it demanded on everybody else. If you look at the the Novotny versus Trip case, that says that it's okay. Uh, class of one theory applies if there is a different rule applied to landowners than his or her neighbors, which is exactly what happened in this case. In this case, we think the evidence is undisputed that the broonings were were treated differently without a legitimate basis. But again, don't take my word. Look at the district court's preliminary summary judgment order. The district court determined correctly that the city does not dispute the provided evidence in support of its argument that the comparable properties engaged in different uses than the broodings and the city did not link the alleged differences in the property with any rational basis for the disparate treatment. Those findings were not cross appealed by the city. They were never challenged by the city. Uh, you know, Mr Bruno, if you were to win here, why wouldn't anybody who's been given a speeding ticket have this exact same argument? Oh, because I let hundreds of people go who were speeding and you got me because I don't think that the speeding ticket is an impairment of a fundamental right, which is which in the bruning case is their right to enjoy their use their property as they see fit. And there are cases that established that in these type of circumstances where a government agency discriminates in the areas of land use or property that equal protection claims can apply. And this is a big deal to the broodings because think about what's happening. Um, they're trying. They're being threatened to be evicted from their entire property, including the house and the barn. They're being threatened with criminal prosecution and the difference in the property as it is now and has been for 40 years and the way city wants it is a $2.8 million reduction. This isn't a speeding ticket. This is a real significant thing. Um, what we think is after the district court made these preliminary findings, it should have stopped there because the broonings had met their summary judgment standard and the city failed to meet its birding. Um, and if you look, you could see the irrational treatment simply from the face of the notice of violations. They're materially different. The broonings were given five days to comply while the comparable properties were given 30 days to comply. When we asked Mr Davis, the issuer of those notices, why the disparity in treatment? His answer was can't answer that don't know. Well, if the issuer doesn't know who knows and the reason he doesn't know is because these numbers were arbitrary. The broonings were treated differently and nobody can tell you why. Um, the broonings were required to bring all the structures on their property up to code, even ones that were grandfathered or not deemed to be non conforming. The cost of that is $1.5 million. The broonings were were required to be completely evicted from their property. Um, the with respect to the comparable properties, it was simply a request to stop but non conforming use. The broonings were threatened with legal and criminal prosecution. No similar threats against the comparable properties. Um, all that was done to the other properties was one letter sent in 2017 to appease the broonings at their request, and those letters to the other properties were ignored. Now, this is a significant factor because the district court said, well, the broonings had 18 months to work this out. Okay, so if you utilize the district courts logic, it still shows that the broonings were treated differently than the other properties. Because in 2017, the city was aware that the comparable properties were doing something bad. Um, 18 months thereafter, then, according to the district court, the city should have properties. That would have been about 2018. That never happened. In fact, in June of 2020, it is undisputed that those comparable properties were still engaging in the same uses that the city deemed to be non conforming. So either even under the district court's logic made in the final order for summary judgment after the unauthorized and we think was an improper evidentiary hearing after the city failed to meet its burden. The broonings are still equal protection claim. I would like to reserve the remaining time for rebuttal unless the court has any questions. Well, thank you, Mr Bruno. Miss Taylor. It's Taylor. You need to unmute your microphone, please. My apologies. Good morning. My name is Jennifer Taylor. May it please the court, Mr Bruno. I am the assistant city attorney representing the city of Omaha. Uh, the district court correctly determined, as Judge stress noted that the plaintiff was not denied their right to equal protection by the city as the city had a rational basis for the alleged disparate treatment. Furthermore, the plaintiffs have failed to identify the district disparate treatment with a high degree of specificity, which hindered the court's ability to analyze their claim. The plaintiffs failed to provide evidence that they were similarly situated to the comparative properties with the requisite high degree of detail, and the plaintiffs failed to demonstrate that the city intentionally treated them differently or with malice, a requirement that is necessary under the standard. Secondly, the plaintiff failed to demonstrate intentional misconduct. Such the city would be a stop from undertaking enforcement actions against the plaintiff. Now, as the district court noted, most of the facts in this case are generally undisputed, and as the district court recited those facts, they are as follows. The city received a complaint from a neighbor about the use of the plaintiff's property in March of 2015. The city then sent an inspector to review the property, the plaintiff's property and the use of that property, and that inspector issued a notice of violation on March 18th, 2015. After that notice of violation was issued, subsequent discussions, emails, meetings, multiple correspondences that were exchanged between the plaintiff's plaintiff's representative, their attorney and the city of Omaha and city of Omaha staff. Those included as much as emails, discussions about the nature of the use, draft applications for waivers, etcetera. Uh, in March of 2016, pursuant to a site review meeting on site and a site review plan request, the city of Omaha issued a four page letter to the plaintiffs, two pages from the planning director that stated the numerous zoning code and setback violations of Chapter 55 and a two page letter letter from Mr Davis, indicating various other violations that were occurring at the property. In that letter, the plaintiffs were directed to various different ways they could remedy those violations, including submitting a request for waivers to the Zoning Board of Appeals. That letter was sent in March of 2016. There is no evidence submitted by the plaintiffs or anywhere in the record of any email, phone call, meeting or correspondence between the city and the plaintiff or their attorney between that notice that was sent the email that was sent by Mr Davis on November 1st, 2016. So whether or not the plaintiffs were cooperative at that point in time, between March of 2016 and November of 2016, there was little to no correspondence between the plaintiffs and the city. As such, Mr Davis sent an email that stated in its entirety because the plaintiffs tend to forget the first sentence of this email quote. There has been no additional contact from your office with regards to this property, and the issues have not been resolved. As such, this email will serve as official notice that all the buildings and businesses will be served a notice to vacate. Failure to comply within five days will result in legal and further legal action. This was essentially a notice to the plaintiff's attorney that they needed to actually told they needed to do in is as far back as March of that same year. So after that notice was sent, the record shows that an email was sent from plaintiff's attorney to Mr Davis actually about 12 minutes later, saying I have left you a voicemail. Please call me. A subsequent email was sent later that day, saying thank you for coming to my office to meet. These are the three things you have agreed to do. I will wait 15 days before taking any further action provided you one submit the application to the Zoning Board of Appeals for waivers and to contact the neighbor who's registered the complaint. Those things were done. The waiver application was submitted, and no further action was taken by the city. The very first sentence in that email clearly identifies the rational basis for the difference in treatment that has been espoused by the plaintiff. The letter sent to the other quote unquote comparator property owners states and a complaint has been filed regarding your use of the property. Clearly, an initial correspondence to those property owners, as opposed to an email that says you have not responded to us. You have not talked to us. You are still in violation after 18 months. You need to do something now, or we will take further action. Those those the first senses of those two notices that have been suggested by the plaintiffs is being the basis for the disparate treatment are clearly on their face evidence of the rational basis. As Judge Strauss noted, the history of complaints, the context and the discussion that that occurred is is paramount to that that rational basis. But doesn't the record show that the action on the other properties that got the initial letter whether or not there was three years that elapsed between the initial letter set in March of 2017 to those purported comparative property owners and now is actually irrelevant to the plaintiff's case because the plaintiff filed this action in June of 2018. So that can't be a basis for an argument for selective enforcement when that those facts actually didn't exist at the time the plaintiff filed their complaint. That claim is not right. However, as Judge Arnold noted, the court, the Supreme Court and inquest noted that certain types of actions by the city have discretionary, um, discretionary characteristics. Code enforcement tends to be one of them. It doesn't mean that, as the plaintiff has acknowledged that that the city has argued that code enforcement can never be the basis for a class of one equal protection claim. What? But the city has said is that the city has and city inspectors have discretion when they look and review a claim that comes in or a complaint that comes in as to how they handle it and to whether or not it actually violates the quote. So assuming that simply because Mr. The plaintiff's attorney appeared at a zoning board of appeals hearing and as part of his argument that they should be granted the waivers they requested, they argued that other people are doing it, too, is the basis for a basis for the city to send an inspector out to property is not necessarily the same thing, and that's a discretionary action on behalf of the city. Now, that letter that Mr. The plaintiff's attorney submitted to the zoning board of appeals identified eight properties, only five of which actually had any detail as to the activity going on on the property. And of those five, three of them weren't even zoned agricultural. So to consider them to be comparative properties is actually disingenuous, which was evidence that the city submitted during the evidentiary hearing to very clearly lay out how those comparative properties are not the same as the plaintiff's property. Second of all, the city would point out that simply because somebody has a business address at their home does not mean they are operating a commercial operation from that home. So again, the basis that the plaintiff's used for saying that the comparative properties are the same or similar situated as the plaintiff's property is not nearly done to the degree of specificity that needs to be done. Regardless, the difference between the notices, which is what has been established by the plaintiffs as being the basis for their claim, is clearly it's clearly established in that first sentence. And as this court has pointed out before, that context is necessarily important when looking at a class of one equal protection claim. So you have to look at the context in which the notices were sent in order to determine whether or not they represent disparate treatment and whether or not the comparative properties are similarly situated because the disparity of treatment is key and inherently related to that similarly situated inquiry. So the district court started their initial analysis of this case by saying the threshold inquiry is whether or not the comparative properties are similarly situated. And that's true. This court has determined that that is a court has also noted that identifying the disparity in treatment is especially important in class of one cases because the similarly situated inquiry requires establishing the benefit being sought. So when you look at the similarly situated inquiry, you have to understand when you have to analyze what is being asked for and what is the disparate treatment at issue. So here is the claim that the comparative properties are the same because they are zoned the same and are being used for commercial purposes. It's a very broad and general classification of comparative properties. We're looking at the specific actions by the city identified by the plaintiff as being the disparate treatment. Now it took until, uh, the plane or the plaintiff's brief in response to the city's motion for summary judgment before they actually specifically identified these two notices as being the evidence of disparate treatment. However, if you require a review of the context, so the similar situated industry inquiry therefore must be tied to that specific disparate treatment. Um, the, uh, so in that respect, the properties are not similarly situated to the comparative properties. The content clearly identifies that there is a difference in the notices, and the very first sentence of those notices identifies the rational basis. This court can take that evidence that is in the record and you and and use that to affirm the decision of the district court. Furthermore, um, sorry, furthermore, not only is the rational basis for the difference in notice is clearly evident in that opening sentence. Um, and then you have the context issue asserting that those two notices represent disparate treatment also disregards the context. So that leaves the only other option that the plaintiffs have set forth as being the basis for their unequal protection claim, which is selective enforcement. Selective enforcement, as Judge Arnold noted, has been seen to require not only a showing of intent, but also showing of malice or ill will or purposeful or intentional discrimination. Let me ask you about that statement. Please, Council. Uh, uh, why do you think that attention or malice required? Uh, in in in cases regarding selective enforcement in this kind of case, in this kind of case, because this court in Galey versus Minneapolis Park and Recreation Board stated that in addition to showing that a government entity acted intentionally, a claim for selective enforcement also requires an allegation of ill will, malice or showing of animus, not simply a difference in treatment. How do you square that with the United States Supreme Court case called Olick O. L. E. C. H. Now, in Willowbrook, the Olick, the United Supreme Court said in class of one equal protection claims, there was a requirement that the government intended to show at least intent. The actual additional, uh, the additional requirement of showing ill will or malice was included in Justice Breyer's concurrence and has been used in some district courts or some circuit courts as being an additional element in class of one equal protection claims. However, there's two different claims that are being asserted here. The class of one equal protection claim regarding the disparate treatment between the two notices or a class of one equal protection claim regarding selective enforcement. This court has said, if you're asking about selective enforcement in the class of one equal protection claim, you must also show ill will or malice when it comes to selective enforcement, particularly with show or indicated that certain acts by the government entity inherently have a certain manner of discretion. So in order for a class of one equal protection claim in a selective enforcement case to be valid, you need to also show that the city acted with intentional discrimination, purposeful malice, some sort of intentional act against the plaintiff to say that they were intentionally and with malice trying to enforce against them when they weren't enforcing against someone else. In this case, all we have is a few addresses given to the city during the course of a hearing that benefited the plaintiffs where they said other people are acting badly, too. You should go get those speeders as well so that when you when I'm pulled over for speeding, I should be unhappy with that police officer for not pulling over the six guys that were speeding next to me. And the police officer says, Well, I've looked at that. I missed that. I wasn't been told of that. I wasn't. They didn't my radar on for that or for whatever reason they didn't pull those other speeders over. That is something that is somewhat of a discretionary act on behalf of the city. Council, can I ask you about the equitable estoppel claim? I know opposing Catholic didn't cover it, but I actually my questions are really for for the city here. Um, you have the history of conversations between the plaintiffs and the city, but you also have the city really screwing up along the way. I mean, they did not with due respect, you know, least according the allegations you have the red tag being removed from the property. You have affirmative representations that you don't need permits. Um, you have. You can continue to do it if you resolve certain problems. This all happened. You have the thing with the mayor's assistant. You have 20 years of sort of things going on that to me come pretty close to creating a genuine issue of material fact on affirmative misconduct. And I just want to give you a chance to respond. Thank you very much, Your appreciate you asking that question. Um, let's take one of those issues in turn. So the plaintiffs have asserted that they went into the city every single time they put up a new building and asked whether or not they needed a permit. Now, what Mr Nelson's affidavit says is he when he said my property is owned agricultural, I'm putting up a pole building or this type of building. Do I need a permit? And he was told no. Now, being told no, you don't need a yes, your proposed potential use of that building is approved. All it says is that you can put up the building. It does nothing to do with how you use that building. For example, if I were to come into the city and say, I'm going to build a house. Here's the house I'm going to build. Here are my plans. Here's everything I'm doing may have a permit to build the house. And they look at the plans. They all conform with the International Building Code. They conform with various other parts of the only municipal code. Yes, you may go and build that house. I build that house and then I turn around and use it as a boarding home. Is that boarding home a use that's allowed in that particular zoning area? Probably not. Maybe not. Does getting a permit equates to tacit approval of that boarding house use at a later date and time? No. So city the city telling the plaintiff that they didn't need a permit does not equate to the city saying your use is okay where you're going to do it, how you're going to do it and in that location. So what I just can't rely on the fact they were told they didn't need a permit as being approval of the use to which they put those buildings regarding the removal of the red tag in 2009. Although that is a fact that was raised only at this level and not any earlier. Um, in the city disputes it, even if that fact is taken as true, even if those things actually happened, a removal of the red tag by Mr Davis in 2009 is not tacit approval of the construction of a brand new building in a place where one didn't exist before, which was done in 2012. It is not approval of any change of use of those buildings going forward, nor is an approval of the use of that building that was later constructed. I would point out to the court that the building that was constructed in 2012 is the building that houses the boiler manufacturer, which was the source of the neighbor's complaint. So the plaintiffs are arguing that Mr Davis said what we were doing in 2009 was okay. That means we can do whatever we want going forward as long as we think it's the same thing as we were doing back then. Again, the plaintiffs can't rely on that action to continue to take different and increasingly more intense actions going forward or new actions in new construction and rely on that removal of the red tag. And then, 17 are after that November 1st 2016 notice and occurred during the hearings before the Zoning Board of Appeals. I would point out to the court that the Zoning Board of Appeals is an independent body that does not represent the city or the plaintiff is an independent body that hears applications for waivers of Omaha municipal code. So even if they went and asked the mayor to tell the Z. B. A. To give them their waiver, the Z. B. The of those actions by the mayor or during those hearings are not relevant to the actions that the city took and cannot be evidence of the city's act of affirmative misconduct. And for those reasons, I think it's very clear that this court can affirm the decision of the district court and that the city did not violate the plaintiff's rights to equal protection. And the city is not equitably stopped from continuing to enforce its zoning code against the illegal uses of the plaintiff's property. Thank you, Miss Taylor. Ms rebuttal. You'll have to unmute your microphone, Mr. Brown. One of the major problems we have with the underlying proceedings is the district court simply didn't enforce the rules against the city. For example, the city didn't submit a issue statement of facts in support of their motion for summary judgment or dispute our motion for summary judgment properly. So we had a hard time discerning what the city disputed or didn't dispute the facts upon which the city was rely upon and the evidence upon which the city was relying upon. So we were always facing an unknown and shifting target. And Miss Taylor's argument today kind of highlights that property because Miss Taylor said a lot of things to this court. But if you look in the record, you're not going to find an evidentiary basis for them. They're simply nothing but argument on legal conclusions that don't have any actual support. And I pointed out in my reply brief that if you look at the evidence that the city cites to in their brief on this appeal of the supposed dissimilarities of the property, it doesn't cite to evidence. It cites to the city's argument in its summary judgment brief below. So that's one of the things. For example, Miss Taylor just said that the red tag wasn't presented in the district court below. It 100% was asserted in the Miss Taylor also said that we didn't identify specifically the disparities in treatment or the other properties. Well, that's simply inaccurate. If you look at the district court's preliminary summary judgment ruling issued in June of 2020, the city goes through or the judge goes through specifically our arguments and agrees with us that we showed a difference in treatment of properties and said the city doesn't even dispute that treatment. So to sit here and say that we didn't identify with specificity, the disparate treatment is simply not accurate and completely refuted not only by the record, but the district court's preliminary findings, which basically should have been, in our opinion, the district court's final findings regarding the issue in regards to malice or intention. Judge Strauss brings it out or mentioned it previously. There was certainly malice or intention at the late stages. The city came to the bruning and said, Well, if you make if you fix a couple of the life safety issues, you know, we'll let your uses continue. The brunings did that. But yet the city didn't do that. And finally, the mayor's office came to the brunings and said, Hey, don't make a fuss of this before the election. If you hold off until after, we'll be willing to work with you. I see him out of time. I appreciate listening and thank you. Thank you. The court appreciates both of your appearance and arguments today. The case is submitted and we will decide it in due course.